UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America,

        Plaintiff,

                Crim. No. 16-CR-246(3) (JRT/FLN)

v.

W. Jeffrey Taylor,

        Defendant.

---

**MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL – COUNTS 4, 7 & 19**

---

  Defendant W. Jeffrey Taylor, through the undersigned attorney, respectfully moves this Court for judgment of acquittal on all three counts of conviction.

### Summary Of Trial Record

  Trial began, after jury selection, on January 17, 2018 and proceeded through January 26, 2018, without presentation of any evidence related to the Transducer Matters, except foundational testimony on a search warrant executed at Defendant Taylor's home. In its opening statement, the Government relied heavily on a theory of concealment for all charged conduct, including both the Retail and Transducer Matters, as against both Sonion, and Starkey or Bill Austin. During the first two weeks of trial, the Government called witnesses to suggest that Ruzicka and other Starkey employees forged Austin's signature on documents (e.g. Kuiken, Kinney), and violated Ruzicka's fiduciary duties by (1) not engaging Starkey in the hearables business, (2) trying to recruit Starkey employees for a new business venture, (3) planning a new business venture and (4) granting employment contracts to key executives without Austin's approval (e.g. Schissel, McCormick, Kinney, Duchsher). Further the Government introduced

evidence to suggest that Ruzicka, Nelson and Miller altered descending gross payroll reports, documents Austin purportedly relied on in assessing Starkey's performance. (e.g. Julie Miller Payroll, various foundational witnesses). Finally, the Government called its first cooperating witness, Jeffrey Longtain, to testify that he did not believe Austin knew about the Northland restricted stock grant and payout because Longtain thought, based on Austin's character and disposition, that Austin would have asked for Longtain to thank him had Austin known about the arrangement.

After the Super Bowl break the Government called two Sonion witnesses, Greg Hovland and Christian Nielsen, to testify about facts underlying Archer Acoustics as well as Defendant Taylor's employment contracts and job duties to Sonion. The Government also called Ed Retel, a retired, former Sonion employee to testify about Archer Acoustics. A fair summary of this testimony is, first, that despite the Sonion U.S. employees doing administrative and customer service work for customers who received Acoustics pricing, the Sonion U.S. employees were not specifically informed by Defendant Taylor of his ownership interest and financial gain from Acoustics. Next, at least as of 2011, the Sonion A/S employees did not know of or specifically approve Taylor's personal involvement in Acoustics, and that in 2012 Taylor took steps to conceal his personal involvement from Sonion A/S's finance department by disclosing all material facts about Acoustics except his beneficial ownership interest.

The Government's first witness to provide any directly relevant testimony about Archer Consulting was Anne Jorgensen.[1] Jorgensen explained that as a payroll clerk, she processed the Archer Consulting payments, ultimately at Ruzicka's direction and that Ruzicka never disclosed

---

[1] To the extent that Nielsen or other witnesses testified about Taylor's employment contracts, this evidence was only relevant pursuant to the Court's pretrial rulings, on whether or not Taylor had an intent to defraud through the Archer Consulting.

to her that he was a beneficial owner for Archer Consulting.  Jorgensen, of course, was not on the Starkey management team, nor did she directly report to Ruzicka or have any authority to determine how Starkey paid outside vendors.

Next the Government called Bill Austin.  After ample background testimony Austin explained that he reviewed descending gross payroll reports to monitor employee compensation. (Day 12 T. at 52).  He said:

> a descending gross payroll was, as I had requested, was the person's total compensation all in, what would be on their W-2. And I would look at the highest to the lowest paid employee in Starkey. The reason I looked at that is because the employee payroll is our single largest expense without -- by far.

He also looked at Starkey's line of credit and unit production reports, but claimed he did not review any other financial reports like audited financials, budgets or tax returns.  (T. at 51 - 54); (T. at 75 - 78).

With respect to Austin's delegation of authority to, and supervision of, Ruzicka, Austin said:

> it was my understanding, I felt, that the consulting with me would be required on things out of the ordinary conduct of business as it had been conducted, as he was conducting it before, even as manufacturing had, so I thought that purchases of a building or investments in anything, retail office or anything else, would be discussed. [2]

(T. at 83)

Shortly thereafter, the Government inquired of Austin about Archer Acoustics and Claris:

> Q. … Mr. Austin, prior to the investigation that commenced in September of 2015, had you ever heard of Archer Acoustics?
>
> A. I -- I did not know of that company.
>
> Q. What about a company by the name of Claris, Mr. Austin? Before September of 2015, had you ever heard of that company?

---

[2] Austin's statement "even as manufacturing had" refers to the arrangement between Austin and Ruzicka before Ruzicka became President, when Ruzicka ran Starkey's manufacturing.

A. I did not.

(T. at 84).

The Government next elicited denials from Austin pertaining to his knowledge of Archer Acoustics customers Auric Horsysteme and ExSilent. (T. at 84 - 85).

After a discussion of the Northland Restricted Stock arrangement, the Government inquired about Archer Consulting, Austin denied knowledge of the company. (T. at 106). The Government asked:

Q. Mr. Austin, did you ever approve of paying consulting fees to Jerry Ruzicka **and** Jeff Taylor for any reason?

A. I would not.

Q. Can you conceive of **any consulting that Mr. Ruzicka** would be doing for Starkey that wouldn't be covered under his duties and compensation as the President for Starkey?

A. Not at all. Nothing.

(T. at 107)(**emph. added**)

Next, after a discussion of Sound Point, the Government returned to the topic of Ruzicka's overall authority and Austin's supervision of Ruzicka. Austin testified that at one point, he was dissatisfied with Ruzicka because Ruzicka purchased a building without consulting Austin. (T. at 114). Austin also explained that he was dissatisfied with Ruzicka's purchase of Envoy Medical stock, without Austin's express approval. (T. at 117 - 19).

Finally, over hearsay objection by Defendant Taylor and others, the Government played a recorded conversation between Ruzicka and Austin, on the day of Ruzicka's firing. (T. at 141). The recording began with a discussion around technology, starting with information from Taylor about using a hydrogen fuel cell to power a hearing aid. However, the tenor of the recording changed when Austin brought up his accusations. The vast majority of the conversation focused on topics like hearing fusion, Ruzicka's alleged plans to compete with Starkey (as Austin

imagined them), and the granting of employment contracts to key executives. The Government then elicited explanations for Austin about topics discussed on the tape, but not about the initial technology conversation pertaining to Defendant Taylor, highlighted by Austin's claim regarding James Picolo that "it left me no choice but to think that Mr. Ruzicka was capable of lying to my face." (T. at 145 - 153; 151).

On cross examination by Defendant Ruzicka's counsel, Austin admitted that Starkey used consultants, and explained that consultants are fine if they generate value. (T. at 169); (Day 13). Austin agreed that some Starkey consultants, including consultants suggested and approved by himself, were paid out of the president's office budget, the same as Archer Consulting. (T. at 179). Austin knew and approved of other consultants, such as the Manhart family, who were paid differently than those on the president's budget (T. at 178).

Special Agent Matt Snell testified as a summary witness with respect to Archer Consulting and Archer Acoustics. He generally testified to facts that the Government later used to argue that Defendants Taylor and Ruzicka concealed Archer Consulting from Austin or Starkey. Those facts were:

(1) Archer Consulting was incorporated in Defendant Taylor's name.

(2) Its payment structure changed overtime with no obvious relationship to consulting services, but instead due to the needs of a separate investment by Taylor and Ruzicka.

(3) Archer Consulting entered into a back dated contract with Starkey calling for the consultant to provide services only to the president.

(4) Defendants Taylor and Ruzicka were paid as employees which allowed for Archer Consulting to make 401(k) payments based on a certification that Taylor would perform 1000 hours of work annually for Consulting.

(5) In perhaps two emails Ruzicka referred to Archer Consulting in the third person or as Jeff's company.

    (6) Upon his non-comprehensive review of documents, he found no evidence that Archer Consulting did consulting work.

Snell agreed on cross examination, however, that he did not look for and had never been informed of any of the examples of consulting work later testified to by Taylor, and supported by documentary evidence and data such as the development of the Sound Lens product, the negotiation of a Receiver-In-Canal license with SeboTek, the incorporation of a hydrogen fuel cell into Starkey hearing aids, or the United Health business arrangement for discounted hearing aid manufactured by Intricon.

    Cooperating witness Scott Nelson testified on direct that he did not know Defendant Ruzika had a beneficial interest in Archer Consulting, and that such an arrangement should have been disclosed to Starkey's auditors as a related party transaction. On cross examination, however Nelson testified that he and Austin knew Defendant Taylor was being paid by Starkey as a consultant. In addition, Nelson asked Austin to provide Nelson direction on what limits Austin placed on Ruzicka's authority; Austin refused to provide Nelson any direction on what Ruzicka could not do without Austin's approval. (T. at 58 – 59)(Day 19). On redirect, Nelson conceded that Austin might not have known the name "Archer Consulting" but that he did know Starkey paid Defendant Taylor as a consultant.

### Standard Of Determination - Motion for Judgment of Acquittal

    Federal Rule of Criminal Procedure 29 provides that the district court "must enter judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Courts consider "the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Scofield*, 433 F.3d 580, 584–85 (8th Cir. 2006).

## Mail And Wire Fraud Counts 4, 7 & 19

Counts 4, 7 and 19 of the Third Superseding Indictment allege that Mr. Taylor committed mail and wire fraud. "To establish mail fraud pursuant to 18 U.S.C. § 1341, the United States must prove: '(1) a scheme to defraud by means of material false representations or promises, (2) intent to defraud, (3) reasonable foreseeability that the mail would be used and (4) [that] the mail was used in furtherance of some essential step in the scheme.'" *United States v. Louper-Morris*, 672 F.3d 539, 555 (8th Cir. 2012) (alteration in original) (quoting *United States v. Bryant*, 606 F.3d 912, 917 (8th Cir. 2010)). Additionally, "[t]o constitute mail fraud, a defendant's misrepresentations must be material." *Id.* (quoting *Bryant*, 606 at 917–18).

Wire fraud under 18 U.S.C. § 1343 is "virtually identical" to mail fraud, except that § 1343 applies where interstate wire communications, rather than the mails, are reasonably foreseeably used in furtherance of the scheme. *See id.* at 555–56. The mail fraud and wire fraud statutes are "given the same broad construction," such that case law interpreting one may be applied to the other. *United States v. Steffen*, 687 F.3d 1104, 1109 n.3 (8th Cir. 2012).

Taylor is entitled to a judgment of acquittal on each count of mail and wire fraud against him because the government presented insufficient evidence that he participated in a scheme to defraud, or that even if he did, the alleged misrepresentations or acts of concealment were material.

## Count 4 – Archer Consulting

The jury convicted Defendant Taylor, with respect to the Archer Consulting allegations, of Count 4 pertaining to a mailed, $60,000 check from Archer Consulting Inc., to Paychex Retirement Services on February 3, 2015. The jury acquitted Defendant Taylor of Count 8 (November 30, 2012 payment from Starkey to Consulting), Count 13 - 18 (Various Fall 2014

Archer Consulting transfers), as well as Count 1, which encompassed Archer Consulting allegations from 2005 through 2015.

The mail and wire fraud statutes do not define what actions can constitute a "scheme to defraud." *See* 18 U.S.C. §§ 1341, 1343. However, the Supreme Court has held that the interpretation of these statutes is constrained by the common-law meaning of "defraud." *Neder v. United States*, 527 U.S. 1, 22 (1999). Thus, because "the well-settled meaning of 'fraud' required a misrepresentation or concealment of material fact" at common law, proof of the same is required for a conviction for mail or wire fraud. *Id.* (emphasis omitted).

In *United States v. Steffen*, the Eighth Circuit applied this reasoning to "determine when acts may constitute a scheme to defraud in the absence of an express misrepresentation." 687 F.3d at 1113. The *Steffen* court explained that common-law fraud encompassed not only affirmative misrepresentations, but also "acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information." *Id.* (quoting *United States v. Colton*, 231 F.3d 890, 898 - 99 (4th Cir. 2000)).

However, the court distinguished concealment from mere nondisclosure, observing that "[a]lthough silence as to a material fact (nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud, suppression of the truth with the intent to deceive (concealment) does." *Id.* at 1114 (quoting *Colton*, 231 F.3d at 899). Thus, to prove a scheme to defraud, the government must prove that the defendant either: (1) misrepresented a material fact; (2) failed to disclose a material fact despite an independent legal obligation to do so; or (3) took affirmative actions to conceal a material fact. *See id.* at 1113 - 14.

The Government's ultimate theory of prosecution on Archer Consulting was Defendants Taylor and Ruzicka concealed Ruzicka's involvement and ownership in Archer Consulting from

Austin.  This theory is unsupported by sufficient evidence for a number of independently persuasive reasons.

First, Austin never testified that he prohibited Ruzicka from, or lacked knowledge of, Defendant Taylor (as opposed to Defendant Ruzicka) being paid by as a consultant.  Instead, Austin did not purport to place any limits or controls on how Starkey, or Ruzicka, hired consultants or dealt with subcomponent suppliers.  In these two areas, as opposed to on employee compensation or stock transactions, Ruzicka had absolute, unquestioned authority to act for Starkey.  Furthermore, Nelson testified Austin had affirmative knowledge that Starkey employed Taylor as a consultant, a fact Austin did not deny.  As a result, Ruzicka had full and proper authority to hire Taylor through Archer Consulting.  Ultimately, Austin's complaint about lacking knowledge of payments to Ruzicka is unavailing.  Austin is not the claimed victim, Starkey is, and in with respect to Archer Consulting, Ruzicka was well within his authority to hire Taylor as a consultant.

While Austin denied knowing the business name Archer Consulting, the payments to Archer Consulting were nonetheless open and notorious on Starkey's books for anyone who cared to review them.  Thus, Austin's only ground for complaint is that Taylor should not have allowed the Archer Consulting payments to be paid out to Ruzicka.  Austin could not, and did not, complain about the particular amounts paid to Archer Consulting being excessive and the Government proffered no evidence that the amounts were concealed.  Because Archer Consulting was Defendant Taylor's company, and Austin knew Starkey paid Taylor as a consultant, Archer Consulting compensating Ruzicka is immaterial.  The payments were made to Taylor's company, with Austin's knowledge, thus Taylor could spend the proceeds as he saw fit,

including compensating Ruzicka for his work with Taylor in maintaining a competitive transducer market between Sonion and Knowles.

Second, Taylor neither affirmatively acted, nor aided and abetted Ruzicka, in any claimed concealment of Archer Consulting from Starkey or Austin. Again, concealment from Austin can only constitute fraud against Starkey if the concealment related to an area where Austin purported to limit Ruzicka's authority to act for Starkey. The acts of concealment proffered by the Government involving Taylor, principally through Agent Snell, amounted to wholly innocent behavior including how Archer Consulting spent its funds, the fact that Archer Consulting entered into a backdated contract (just as Sonion did with Taylor on multiple occasions) with Starkey, the fact that Taylor was listed as the registered owner and so forth. The only affirmative acts that could be even construed as concealment were two vague emails where Ruzicka referred to Taylor or Archer Consulting, as the consultant or payee, without mentioning his ownership interest. But these emails were neither directed to, nor reasonably foreseeable to reach, Austin, thus they cannot be considered material acts of concealment. The recipients, Scott Nelson and Anne Jorgensen, lacked any authority to question or prohibit the Archer Consulting arrangement. Further, Defendant Taylor did not author, send, or otherwise contribute to these emails, thus he did not aid and abet the exceedingly paltry actions attributed to Ruzicka as concealment.

Third, despite the Government ad hominem and baseless verbal attacks, the only evidence in the record is that Archer Consulting was a phenomenal deal for Starkey, it was not a "sham company." Taylor uncontroverted testimony, supported by documents and data, showed the overwhelming value of his industry knowledge, technical abilities, and relationships, provided to Starkey. He provided significant, valuable advice to Ruzicka over the years, while similarly not have a temptation to leave Sonion in the face of its numerous difficulties caused by

ownership changes, cultural differences, and an unhelpful approach to cooperative research and development.  While the Government clearly disapproves, there is nothing inherently illegal or wrong with a company using a consulting agreement to secure a relationship with a favored supplier, particularly in the unique world of the hearing aid industry where transducers are provided by a competitive duopoly.  The conviction on Count 4 is, further, logically inconsistent with the numerous acquittals on other Archer Consulting counts, and very likely resulted from the Government's misuse of evidence that should not have been admitted or only limited for argument as to intent, such as the 1,000 hour document, Defendant Taylor's employment contracts, the use of a 401(k), poor worded emails, and other wholly lawful but nonetheless unfairly prejudicial evidence.

## Count 7 Wire Fraud – Archer Acoustics And ExSilent

The jury convicted Defendant of Count 7, a wire transfer of $46,776.80 on March 19, 2012, from ExSilent to Archer Acoustics.  ExSilent was a Dutch manufacturer that, until 2009, refused to purchase Sonion transducers because Sonion would not deal with them directly.  Instead, Sonion A/S referred them to Audiotronics, the Italian distributor who ExSilent was dissatisfied with.  Hagen worked with ExSilent on their product and introduced them to Ruzicka and Taylor, ultimately recruiting them as a customer of Sonion U.S.  At the time, from 2009 through the Count 7 payment, Archer Acoustics would order transducers from Sonion at the Starkey price, and then invoice ExSilent at a markup, just a Audiotronics did with Sonion's approval.  The Count 7 payment, as it did not flow through Sonion's bank account, resulted from the initial Acoustics structure, as opposed the later model where Sonion paid Archer Acoustics a commission.  The emails and testimony of Nielsen and other Sonion A/S finance staff, which

constitute the bulk of the Government's concealment case, occurred after the Count 7 payment. There is insufficient evidence of concealment as of March 19, 2012.

Any acts of concealment taken on or before March 19, 2012 are also immaterial. Sonion A/S had declined to do business with ExSilent for many years. Taylor used Archer Acoustics to win new business from Knowles, ultimately for Sonion A/S's benefit, at the Starkey price which Sonion A/S was happy to sell transducers at, and profited from even with the difference between the Starkey price and the ExSilent price taken out by Acoustics. Were it not for Acoustics, there would have been zero profit to Sonion from ExSilent sales, whereas with Acoustics Sonion enjoyed new, profitable transducer sales. As a result, there is insufficient evidence of materiality, as well as intent to defraud, on Count 7.

### Count 19 Wire Fraud – Archer Acoustics

The jury convicted Defendant Taylor on Count 19 for a $54,836.95 transfer from Sonion to Archer Acoustics on July 7, 2015. By this point, Taylor had arranged for Sonion to pay quarterly commissions to Acoustics based on a percentage of aggregate sales to ExSilent, Manan, Audina, and Auric. While it is, thus, impossible to attribute this payment to any one customer, the evidence at trial showed that but for Acoustics and Claris, none of the subject purchases would have been made at all. Further, all material facts were presented to Sonion by Taylor, specifically that Archer Acoustics was an affiliate of Starkey based on Ruzicka's direction, and Archer Acoustics did serve as a vehicle for Starkey to source new transducer business to Sonion as opposed to Knowles. Since Sonion was happy to sell to Starkey at the Starkey price, and generally wished to keep Starkey satisfied as its best customer, the omission of Taylor's ownership interest in Archer Acoustics was immaterial, and lacked intent to defraud.

Date:  April 12, 2018	Respectfully submitted,

             By:  */s/*_____
                William J. Mauzy (#68974)
                Casey T. Rundquist (#0390475)
                800 Hennepin Avenue
                Suite 800
                Minneapolis, MN 55403
                (612) 340-9108
                *Attorney for Defendant*