UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 16-CR-246(3) (JRT/FLN) |
| Plaintiff, | |
| v. | **MOTION FOR NEW TRIAL DUE TO** |
| W. JEFFREY TAYLOR, | **MISJOIDER OF DEFENDANTS** |
| Defendant. | |

Pursuant to Fed. R. Crim. P. 8(b) and Fed. R. Crim. P. 33, Defendant Taylor hereby moves for a new trial due to misjoinder of Defendants Ruzicka, Miller, and Hagen (regarding the Sound Point evidence) with respect to Counts 2, 3, 5, 9, 10, 11, 12, 24 & 25 (hereinafter the "Starkey Retail Matters") and Count 1.  Under Rule 8(b), the Starkey Retail Matters did not constitute "the same act or transaction, or in the same series of acts or transactions" as Counts 4, 6 - 8, 13 - 23, (hereinafter the "Transducer Matters)", further Count I was not a unitary conspiracy.  As result, voluminous, irrelevant evidence presented only on the Starkey Retail Matters, especially the claims of concealment from William Austin (hereinafter "Austin") through supposed forged signatures, altered descending gross payroll reports, and recorded, allegedly false oral statements, caused an unacceptable level of unfair prejudice to Defendant Taylor, necessitating a new trial on all three Counts of conviction.

**Summary Of Trial Record**

Trial began, after jury selection, on January 17, 2018 and proceeded through January 26, 2018, without presentation of any evidence related to the Transducer Matters, except

1

foundational testimony on a search warrant executed at Defendant Taylor's home.  In its opening statement, the Government relied heavily on a theory of concealment for all charged conduct, including both the Retail and Transducer Matters, as against both Sonion, and Starkey or Bill Austin.  During the first two weeks of trial, the Government called witnesses to suggest that Ruzicka and other Starkey employees forged Austin's signature on documents (e.g. Kuiken, Kinney), and violated Ruzicka's fiduciary duties by (1) not engaging Starkey in the hearables business, (2) trying to recruit Starkey employees for a new business venture, (3) planning a new business venture and (4) granting employment contracts to key executives without Austin's approval (e.g. Schissel, McCormick, Kinney, Duchsher).  Further the Government introduced evidence to suggest that Ruzicka, Nelson and Miller altered descending gross payroll reports, documents Austin purportedly relied on in assessing Starkey's performance. (e.g. Julie Miller Payroll, various foundational witnesses).  Finally, the Government called its first cooperating witness, Jeffrey Longtain, to testify that he did not believe Austin knew about the Northland restricted stock grant and payout because Longtain thought, based on Austin's character and disposition, that Austin would have asked for Longtain to thank him had Austin known about the arrangement.

After the Super Bowl break the Government called two Sonion witnesses, Greg Hovland and Christian Nielsen, to testify about facts underlying Archer Acoustics as well as Defendant Taylor's employment contracts and job duties to Sonion.  The Government also called Ed Retel, a retired, former Sonion employee to testify about Archer Acoustics.  A fair summary of this testimony is, first, that despite the Sonion U.S. employees doing administrative and customer service work for customers who received Acoustics pricing, the Sonion U.S. employees were not specifically informed by Defendant Taylor of his ownership interest and financial gain from

Acoustics. Next, at least as of 2011, the Sonion A/S employees did not know of or specifically approve Taylor's personal involvement in Acoustics, and that in 2012 Taylor took steps to conceal his personal involvement from Sonion A/S's finance department by disclosing all material facts about Acoustics except his beneficial ownership interest.

The Government's first witness to provide any directly relevant testimony about Archer Consulting was Anne Jorgensen.[1] Jorgensen explained that as a payroll clerk, she processed the Archer Consulting payments, ultimately at Ruzicka's direction and that Ruzicka never disclosed to her that he was a beneficial owner for Archer Consulting. Jorgensen, of course, was not on the Starkey management team, nor did she directly report to Ruzicka or have any authority to determine how Starkey paid outside vendors.

Next the Government called Bill Austin. After ample background testimony Austin explained that he reviewed descending gross payroll reports to monitor employee compensation. (Day 12 T. at 52). He said:

> a descending gross payroll was, as I had requested, was the person's total compensation all in, what would be on their W-2. And I would look at the highest to the lowest paid employee in Starkey. The reason I looked at that is because the employee payroll is our single largest expense without -- by far.

He also looked at Starkey's line of credit and unit production reports, but claimed he did not review any other financial reports like audited financials, budgets or tax returns. (T. at 51 - 54); (T. at 75 - 78).

With respect to Austin's delegation of authority to, and supervision of, Ruzicka, Austin said:

---

[1] To the extent that Nielsen or other witnesses testified about Taylor's employment contracts, this evidence was only relevant pursuant to the Court's pretrial rulings, on whether or not Taylor had an intent to defraud through the Archer Consulting.

it was my understanding, I felt, that the consulting with me would be required on things out of the ordinary conduct of business as it had been conducted, as he was conducting it before, even as manufacturing had, so I thought that purchases of a building or investments in anything, retail office or anything else, would be discussed. [2]

(T. at 83)

Shortly thereafter, the Government inquired of Austin about Archer Acoustics and Claris:

Q. … Mr. Austin, prior to the investigation that commenced in September of 2015, had you ever heard of Archer Acoustics?

A. I -- I did not know of that company.

Q. What about a company by the name of Claris, Mr. Austin? Before September of 2015, had you ever heard of that company?

A. I did not.

(T. at 84).

The Government next elicited denials from Austin pertaining to his knowledge of Archer Acoustics customers Auric Horsysteme and ExSilent.  (T. at 84 - 85).

After a discussion of the Northland Restricted Stock arrangement, the Government inquired about Archer Consulting, Austin denied knowledge of the company. (T. at 106). The Government asked:

Q. Mr. Austin, did you ever approve of paying consulting fees to Jerry Ruzicka **and** Jeff Taylor for any reason?

A. I would not.

Q. Can you conceive of **any consulting that Mr. Ruzicka** would be doing for Starkey that wouldn't be covered under his duties and compensation as the President for Starkey?

A. Not at all. Nothing.

(T. at 107)(**emph. added**)

---

[2] Austin's statement "even as manufacturing had" refers to the arrangement between Austin and Ruzicka before Ruzicka became President, when Ruzicka ran Starkey's manufacturing.

Next, after a discussion of Sound Point, the Government returned to the topic of Ruzicka's overall authority and Austin's supervision of Ruzicka. Austin testified that at one point, he was dissatisfied with Ruzicka because Ruzicka purchased a building without consulting Austin. (T. at 114). Austin also explained that he was dissatisfied with Ruzicka's purchase of Envoy Medical stock, without Austin's express approval. (T. at 117 - 19).

Finally, over hearsay objection by Defendant Taylor and others, the Government played a recorded conversation between Ruzicka and Austin, on the day of Ruzicka's firing. (T. at 141). The recording began with a discussion around technology, starting with information from Taylor about using a hydrogen fuel cell to power a hearing aid. However, the tenor of the recording changed when Austin brought up his accusations. The vast majority of the conversation focused on topics like hearing fusion, Ruzicka's alleged plans to compete with Starkey (as Austin imagined them), and the granting of employment contracts to key executives. The Government then elicited explanations for Austin about topics discussed on the tape, but not about the initial technology conversation pertaining to Defendant Taylor, highlighted by Austin's claim regarding James Picolo that "it left me no choice but to think that Mr. Ruzicka was capable of lying to my face." (T. at 145 - 153; 151).

On cross examination by Defendant Ruzicka's counsel, Austin admitted that Starkey used consultants, and explained that consultants are fine if they generate value. (T. at 169); (Day 13). Austin agreed that some Starkey consultants, including consultants suggested and approved by himself, were paid out of the president's office budget, the same as Archer Consulting. (T. at 179). Austin knew and approved of other consultants, such as the Manhart family, who were paid differently than those on the president's budget (T. at 178).

Special Agent Matt Snell testified as a summary witness with respect to Archer Consulting and Archer Acoustics. He generally testified to facts that the Government later used to argue that Defendants Taylor and Ruzicka concealed Archer Consulting from Austin or Starkey. Those facts were:

(1) Archer Consulting was incorporated in Defendant Taylor's name.

(2) Its payment structure changed overtime with no obvious relationship to consulting services, but instead due to the needs of a separate investment by Taylor and Ruzicka.

(3) Archer Consulting entered into a back dated contract with Starkey calling for the consultant to provide services only to the president.

(4) Defendants Taylor and Ruzicka were paid as employees which allowed for Archer Consulting to make 401(k) payments based on a certification that Taylor would perform 1000 hours of work annually for Consulting.

(5) In perhaps two emails Ruzicka referred to Archer Consulting in the third person or as Jeff's company.

(6) Upon his non-comprehensive review of documents, he found no evidence that Archer Consulting did consulting work.

Snell agreed on cross examination, however, that he did not look for and had never been informed of any of the examples of consulting work later testified to by Taylor, and supported by documentary evidence and data such as the development of the Sound Lens product, the negotiation of a Receiver-In-Canal license with SeboTek, the incorporation of a hydrogen fuel cell into Starkey hearing aids, or the United Health business arrangement for discounted hearing aid manufactured by Intricon.

Cooperating witness Scott Nelson testified on direct that he did not know Defendant Ruzika had a beneficial interest in Archer Consulting, and that such an arrangement should have been disclosed to Starkey's auditors as a related party transaction. On cross examination, however Nelson testified that he and Austin knew Defendant Taylor was being paid by Starkey

as a consultant. In addition, Nelson asked Austin to provide Nelson direction on what limits Austin placed on Ruzicka's authority; Austin refused to provide Nelson any direction on what Ruzicka could not do without Austin's approval. (T. at 58 – 59)(Day 19). On redirect, Nelson conceded that Austin might not have known the name "Archer Consulting" but that he did know Starkey paid Defendant Taylor as a consultant.

Before trial, Defendant Ruzicka moved for severance on the grounds discussed herein, which Defendant Taylor joined. (Doc. # 131, 152).

### This Court Should Declare A Mistrial Due To Misjoinder Of The Starkey Retail Matters And The Transducer Matters

Fed. R. Crim. P. Rule 8 reads:

**Rule 8. Joinder of Offenses or Defendants**

(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

(b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

The Eighth Circuit has held that when, as in this matter, "an indictment joins defendants as well as offenses, the propriety of the joinder of offenses is governed by Rule 8(b), rather than Rule 8(a)." *United States v. Mann*, 701 F.3d 274, 289 (8th Cir. 2012); *citing United States v. Jones,* 880 F.2d 55, 60 - 61 (8th Cir. 1989). Thus, joinder of the Transducer Matters and the Starkey Retail Matters is only proper if the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions." Fed. R. Crim. P. 8(b). "Generally, the 'same series of acts or transactions' means acts or transactions that are pursuant

7

to a common plan or a common scheme." *United States v. Wadena*, 152 F.3d 831, 848 (8th Cir. 1998).

Furthermore, while the Eighth Circuit has held that the Court must not rely on facts beyond the face of the Indictment when ruling on a Rule 8 motion before trial, after verdict the district courts consider the trial record as a whole. *Compare United States v. Grey Bear,* 863 F.2d 572 (8th Cir.1988) (en banc) (per curiam)(wherein en banc court divided evenly on the question of whether the Government could supplement the record pre-trial, to bolster its case for joinder, as opposed to relying solely on the Indictment); *Wadena*, 152 F.3d at 849 (plainly reviewing the entirety of the trial record to determine Rule 8 issue after verdict); *Mann*, 701 F.3d at 290 - 92 (same). In addition, on appeal, prejudice must be demonstrated based on the five-factor test articulated in *United States v. Lane*, 474 U.S. 438 (1986) and applied in *United States v. Sazenski*, 833 F.2d 741, 745 - 46 (8th Cir. 1987). [3]

## A: The Transducer Matters and The Starkey Retail Matters Lacked A Common Plan Or Common Scheme

The Transducer Matters and The Starkey Retail Matters were not the same series of acts or transactions because they lacked "a common plan or a common scheme." *Wadena*, 152 F. 3d at 848. The term common scheme, or common plan, appears in numerous contexts related to criminal matters such as Rule 8(b) and Fed. R. Evid. 404(b). It generally requires similarity in actors, methods, and motivation - the Eighth Circuit also construes the term "plan" to mean modus operandi, that is "'other crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused.'" *United States v. LeCompte*, 99 F.3d 274,

---

[3] Defendant is aware of no direct authority requiring a district court, ruling on a post-verdict Rule 8 motion, to apply the appellate prejudice standard. Indeed, given the obvious lack of nexus between the Starkey Retail Matters and the Transducer Matters, evidenced in part by the acquittal of all Defendants on Count I, Defendant asks this Court to not afford the Government the benefit of prejudice analysis. However, Defendant will argue prejudice nonetheless.

278 (8th Cir. 1996); *quoting United States v. Drew*, 894 F.2d 965, 970 (8th Cir. 1990), *cert. denied,* 494 U.S. 1089, 108 L. Ed. 2d 959, 110 S. Ct. 1830 (1990), *quoting McCormick on Evidence* § 190(3), at 559 (3d ed. 1984).

Plainly there is insufficient overlap to view the two general matters covered at trial as a common plan or common scheme. There was no evidentiary or logical nexus between the Northland restricted stock issues and Defendant Taylor. Taylor had no interactions or activities related to Northland's business, ownership structure, or otherwise. No evidence suggested he even knew Northland existed, nor knew anything particular about how Starkey sold its end product to retailers or customers. Similarly, no evidence indicated any knowledge on Taylor's part of Austin's claimed internal management practices, specifically that according to Austin, all employee compensation should be on a descending gross payroll report for his review. There is no evidence that Taylor even knew of Larry Miller's or Jeff Longtain's existence beyond their common presence in the courtroom. Furthermore, Nelson did not attribute Taylor with any knowledge or involvement in any Starkey internal matters, and Nelson disclaimed any awareness or participation in the claimed efforts to conceal Ruzicka's ownership of Archer Consulting. Correspondingly, the Sonion witnesses had nothing to say about Starkey's retail operations, internal compensation practices, internal controls and the like. Indeed, Sonion had nothing at all to do with Northland, the two companies sat on opposite sides of Starkey's business structure, in that Sonion supplied components to Starkey while Northland sold finished hearing aids to end customers.

The Government's claimed Defendant Ruzicka was both the center and the rim of a sprawling, hub and spoke conspiracy touching most of Starkey's business operations, including subcomponent supply, finance, manufacturing, banking, auditing, marketing, and

9

retail sales. But the claimed general motivation of an individual defendant, to make as much illicit money as possible, is not sufficient to justify joinder of co-defendants in otherwise factually unrelated matters. *United States v. Bledsoe*, 674 F.2d 647, 657 (8th Cir. 1982). In *Bledsoe*, the Eighth Circuit reversed convictions under similar circumstances to this matter, wherein four co-defendants stood trial for activity allegedly undertaken with one common, lead defendant (Phillips). The *Bledsoe* facts are, like this matter admittedly complicated, however a superficial similarity existed for the *Bledsoe* allegations in that Phillips was engaged in the marketing of farm coop securities (called "Estate Builders") with all Defendants. *Id.* at 656. The Eighth Circuit rejected the Government's argument for joinder based on this general similarity stating "[t]his argument is inapposite. Under Fed. R. Crim. P. 8(b), mere similarity of offenses committed by two or more individuals is not a sufficient predicate for joinder." *Id.* Instead "Rule 8(b) requires that there be some common activity involving all of the defendants which embraces all the charged offenses." *Id.* The *Bledsoe* reversals are very persuasive here; just as it did in *Bledsoe*, the Government merely suggests a generic similarity based on a common business and a common lead Defendant, in that all claimed offenses involve Starkey and Defendant Ruzicka but demonstrate no other similarity or overlap.

**B:** **The Misjoinder Greatly Prejudiced Defendant Taylor**

The misjoinder operated to Defendant Taylor's great prejudice. The *Lane / Sazenski* assessment factors are "(1) failure to give limiting instructions; (2) evidence of guilt that is not overwhelming; (3) admission of evidence that would be inadmissible in a trial of only properly joined defendants and counts; (4) evidence on the improperly joined charges that is indistinct and not easily segregated; and (5) en masse trial of numerous defendants." *Sazenski,* 833 F.3d

at 745 - 46. Conceding that the first factor may be neutral, the other four strongly demonstrate prejudice.

1)  <u>The Evidence Against Defendant Taylor Was Not Overwhelming</u>

Evidence of Defendant Taylor's guilt was not overwhelming. This is, first, demonstrated by the jury's verdicts, in that Defendant was acquitted on 13 of 16 Counts, with acquittal both on Archer Consulting and Archer Acoustics / Claris Counts. While it is impossible to derive a conclusive interpretation of the jury's deliberation process, one logical inference is that they were deadlocked as of Thursday, March 8th, as evidenced by the content of their fourth note. In order to avoid deadlocking, they compromised, returning verdicts shortly after being instructed by the Court on the need for unanimity.

Furthermore, with respect to consulting, the Government's evidence proved that Austin knew Taylor was being paid by Starkey as a consultant. Austin did not testify to the contrary on direct, instead the Government, cleverly, asked him the carefully constructed question "did you ever approve of paying consulting fees to Jerry Ruzicka **and** Jeff Taylor for any reason?" This allowed Austin to respond in the negative, but without testifying as to his knowledge of Jeff Taylor individually being paid as a consultant. This question, and the Government's subsequent inquiry focused only on Ruzicka's consulting activities. The Government's clearly well-planned structure of inquiry positioned it to later argue fraud by concealment of only Ruzicka's involvement. Indeed, the Government's arguably second most important witness, Nelson, explicitly testified that Austin knew Taylor was being paid as a consultant, but that both Nelson and Austin did not know of Ruzicka's beneficial participation in Archer Consulting. Presenting consulting in this fashion, of course, raised the question of how Taylor could have known that Austin (supposedly), would not have approved of Ruzicka being paid

as a consultant. No evidence whatsoever existed as to Taylor's knowledge of Austin's claimed internal controls of Starkey employee compensation, specifically the descending gross payroll reports. Furthermore, no evidence suggested that Archer Consulting violated Austin's purported rule for consultants at Starkey, which is that they needed to provide value. Defendant proved the value of Archer Consulting, unquestionably, based on the success of the various products involved and the testimony of Sergei Kochkin on Starkey's nearly one-billion-dollar savings from the competition fostered between Sonion and Knowles, through Defendant Ruzicka and Taylor's partnership.

Regarding Acoustics and Claris, in contrast, Taylor never denied concealing his ownership interest from Sonion A/S finance and the hearing aid market generally, but instead explained why his actions ultimately benefitted both Starkey and Sonion, positioning a closing argument based on lack of intent to defraud. While the Government attempted on numerous occasions, though Hovland, Retel, and Kinney, to suggest that Taylor diverted existing Sonion profits to Acoustics or Claris, they ultimately adduced no such evidence. Instead the evidence showed that in all occasions, Acoustics and Claris were used to attract or develop new business for Sonion, through the efforts, relationships, reputation, and expertise of Hagen (ExSilent and Auric), Ruzicka (Audina and Mannan), or both.

2) <u>The Misjoinder Resulted In Significant, Otherwise Inadmissible Evidence</u>

Next significant inadmissible evidence came in due to the misjoinder. The Starkey Retail allegations put Ruzicka, Austin, and Starkey's internal practices at issue, allowing the Government to present evidence and argument on a seeming limitless array of post-hoc criticisms of Ruzicka's tenure at Starkey. Issues such as the wisdom investing in hearables, granting new contracts to key executives, planning for a future business venture, taking a

company car, and paying bonuses, likely would have been severely limited if not completely curtailed absent the Starkey Retail Matters. Some of this evidence was extremely and unfairly prejudicial, including the claims Ruzicka and other forged Austin's signature, doctored internal control documents Austin relied on, and that Ruzicka lied to Austin on tape. This lengthy, taped conversation also constituted inadmissible hearsay as against Defendant, given that he was not a co-conspirator with respect to any of the contentious matters discussed between Austin and Ruzicka. *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978).

3) <u>The Misjoinded Evidence Was Indistinct And Not Easily Segregated</u>

This evidence was also indistinct and not easily aggregated, especially with respect to Archer Consulting. The Government presented its entire case, including even Archer Acoustics and Claris, as concealment from Austin. Proceeding in this fashion served to conflate two entirely different circumstances, with respect to what Austin claimed he needed to know and approve, versus what Ruzicka could do on his own. The Government's case, when assessed by attorneys with the benefit of experience and lengthy participation, diverged significantly between the Starkey Retail Matters and the Transducer Matters with respect to Ruzicka's authority and Austin's oversight. Austin claimed, for whatever worth this Court affords his word, to have imposed limitations on Ruzicka's authority on stock transactions (such as Envoy), as well as internal compensation (related to the descending gross payroll reports). In Austin's presentation, Ruzicka should have consulted with him related to these issues and should have disclosed all compensation on the descending gross reports. If true, then Austin would have seen and been in a position to disapprove the Northland stock grant and payout, the Miller bonuses, and the Sound Point purchase. And conversely, Ruzicka would not have had authority to undertake actions unilaterally.

The same is cannot be said for the Transducer Matters. First, with respect to Archer Acoustics and Claris, it was entirely misleading for the Government to argue that somehow, Austin's claimed lack of knowledge was even relevant. These transactions, plainly, served only to benefit Starkey and did not constitute any form of compensation to Ruzicka, from Starkey, such that they ought to have appeared on the descending gross payroll report. Similarly, for Archer Consulting, Austin never purported to limit Ruzicka's authority to hire consultants or to deal with outside suppliers. To the contrary, multiple consultants that Austin acknowledged hiring were, in fact, paid in the exact same fashion as Archer Consulting – through the president's budget. Indeed every witness testified that to any outsider, Ruzicka appeared authorized to transaction deals on Starkey's behalf. Only those Starkey employees privy to Austin's purported use of the descending gross payroll reports, or his complaints about Envoy, would have understood the limitations Austin imagined he placed on Ruzicka's authority to set compensation or transaction in stock.

The Eighth Circuit has held that in assessing the jury's ability to easily segregate misjoinded evidence, the Government' structure of presentation can be determinative. *Wadena*, 152 F.3d at 849. In *Wadena*, the Eighth Circuit suggested that to avoid conflating evidence, the Government should present separate evidence in distinct phases. Here it did not do so, instead its presentation was at best scattershot, if not deliberately calculated to conflate issues, such as by calling the Sonion lay witnesses who principally testified to Archer Acoustics just before calling Austin who did not (and should not) have known much if anything about Acoustics.

In summary, presenting the entire case as concealment from Austin was fundamentally misleading, making the evidence indistinct and not easily segregated by lay people, especially

with respect to Archer Consulting. [4] Jurors cannot inherently be expected to understand how corporate authority is delegated, or how corporations are legally bound to the business relationships they engage in. [5] Instead the Government's conflation of Austin's management with respect to internal and external matters, served to mislead the jury in an already complex area.

    4)   The Trial Constituted An En Mass Trial Of Numerous Defendants

While examples of larger trials exist, a five Defendant trial with two cooperating witnesses who would have been tried jointly if they had not plead guilty, constitutes a relatively large trial. Combining the five Defendants called the jurors to assess a vast array of information, and presented a daunting time commitment. Given that the verdict could be inferred to be a compromise verdict, it is not unreasonable to suggest that the length, complexity, and heterodox nature of the Government's presentation simply wore the jurors down, where a jury focused only on the Starkey Retail Matters or the Transducer Matters would have been better positioned to assess what would still have been two complicated and lengthy cases.

Date:  April 12, 2018　　　　　　　　　　　　　Respectfully submitted,

By:　　　/s/　　　　　　　　　　　
William J. Mauzy (#68974)
Casey T. Rundquist (#390475)
800 Hennepin Avenue, Suite 800
Minneapolis, MN 55403
(612) 340-9108
*Attorneys for Defendant*

---

[4] Indeed, the Government's Exhibit 1 to which Defendant lodged numerous objections, present Archer Consulting as a Starkey internal matter despite it being an arrangement with Defendant Taylor, a Starkey outsider.

[5] Defendant notes here the request for a more specific, standalone jury instruction pertaining to Ruzicka's authority, which the Court denied.